# **Exhibit R**

Gregory A. Nylen (SBN CA 151129)
GREENBERG TRAURIG, LLP
18565 Jamboree Road, Suite 500
Irvine, California 92612
Telephone: 949.732.6500
Facsimile: 949.732.6501
nyleng@gtlaw.com

Steven J. Wadyka, Jr. (admitted *pro hac vice*)
GREENBERG TRAURIG, LLP
2101 L Street NW, Suite 1000
Washington, DC 20037
Telephone: 202.331.3100
Facsimile: 202.331.3101
wadykas@gtlaw.com

Attorneys for Defendants CERVECERIÁ LA
TROPICAL USA LLC and LA TROPICAL HOLDINGS
B.V.

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOLTURA, LLC dba BUCANERO USA, | CASE NO. 3:23-cv-01104-JES-KSC |
| Plaintiff, | Assigned to the Honorable James E. Simmons, Jr. |
| v. | **DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| CERVECERIÁ LA TROPICAL USA LLC and LA TROPICAL HOLDINGS B.V., | |
| Defendants. | Date: October 11, 2023<br>Time: 9:00 a.m.<br>Dept.: 4B |
| | Action Filed: June 13, 2023 |

I, MARK KEEGAN, hereby declare and state as follows:

1.      I am a principal at Keegan & Donato Consulting, LLC, a consulting firm serving litigators and their clients. I am a resident of the State of New York. I am over the age of eighteen (18) years and am competent to give this Declaration. I have personal knowledge of the facts set forth herein and, if called to testify, I would and could completely testify to those facts.

2.      I was retained by Greenberg Traurig, LLP, a law firm representing Defendants Cerveceria La Tropical USA LLC and La Tropical Holdings B.V. ("Defendants") in this action to conduct a study to determine the extent to which, if at all, there is a likelihood of confusion among relevant consumers between the Defendants' Tropi Crystal product and the Plaintiff's PALMA product based on the products' respective trade dress.

3.      Counsel for Defendants has advised me of the following:[1]

a.      In 1888, the Blanco Herrera family established Cuba's oldest brewery, Cerveceria La Tropical, in Havana, Cuba on a hundred acre tract of land purchased from the Kohly family;

b.      The La Tropical brewery produced a beer under the name "La Tropical" and, in the 1920s, introduced a lighter version of "La Tropical" beer branded as "Cristal";

c.      The La Tropical brewery accounted for 60 percent of all beer production in Cuba at the height of its production;

d.      Cristal became Cuba's most popular beer;

e.      In the 1960s, the assets of the Blanco Herrera and Kohly families were confiscated and nationalized in the Cuban revolution;

f.      In 1998, a descendant of the Kohly family, in collaboration with a member of the Blanco Herrera family, began brewing and selling La

---

[1] *See* Defendants' Memorandum of Points and Authorities in Support of its Motion to Dismiss or in the Alternative to Transfer Venue, p. 8.

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Tropical beer again, in Miami;

g. Their company. Three Palms Holdings, LLC, which holds the U.S. rights with respect to the "Cristal" beer trade dress originating with the Blanco Herrera family, sold its assets to Heineken in 2017;

h. In 2017, Defendants began construction on the La Tropical Miami brewery and tap room, located in Miami, which opened in 2020.

i. In April 2023, Defendants launched "Tropi Crystal" beer, bearing the La Tropical house mark and paying homage to its original "Cristal" beer from Cuba and its 1920's trade dress, brewed based on the original "Cristal" recipe;

j. Tropi Crystal beer is currently distributed only in South Florida;

k. Plaintiff Soltura, LLC d/b/a Bucanera USA ("Soltura" or "Plaintiff") is the importer of Cerveza PALMA ("PALMA"), a beer currently distributed in California, Florida, Illinois, Maryland, Texas, and Wisconsin[2]; and

l. The Plaintiff asserts that PALMA beer "is marketed with a distinctive and protected trade dress."[3]

4. Representative examples of the Parties' products appear in Figure 1 below.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[2] Complaint, ¶¶ 11, 13.

[3] Complaint, ¶ 23. The Plaintiff defines its trade dress as "the overall look-and-feel resulting from the distinctive combination of the following non-functional features on an aluminum can and the packaging of these beverages: (a) a green background with a contrasting red stripe that runs diagonally upwards from left to right across the center of the product; (b) the name of the product in white text offset against the red stripe; (c) a white oval displaying a palm tree image; (d) a Spanish phrase featuring 'La Preferida' ('the preferred one') as a slogan."

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

*Figure 1. Representative examples of PALMA and Tropi Crystal products*

**Plaintiff's Product**[4]

CERVEZA
PALMA
LA PREFERIDA
IMPORTED BEER

**Defendants' Product**[5]

IMPORTED FROM MIAMI
CERVEZA
TROPI CRYSTAL
LA AUTÉNTICA
LA TROPICAL
PILSNER CLARA
ELABORADA POR
CERVECERÍA LA TROPICAL

5. In the current matter, the Plaintiff alleges, among other things, that "Defendants' Tropi Crystal products contain the same distinctive, non-functional protectable elements of the PALMA trade dress"[6] and that, therefore, the "Tropi Crystal products improperly infringe on the Palma trade dress."[7] The Plaintiff also alleges that "likelihood of consumer confusion is high because the parties have designed their cans to be reminiscent of a Cuban beer Cerveza Cristal.[8]

6. In accordance with the Plaintiff's allegations, I have been asked to conduct a study to determine the extent to which, if at all, there is a likelihood of confusion among relevant consumers between the Defendants' Tropi Crystal product and the Plaintiff's

[4] https://cervezapalma.com.

[5] https://www.cervecerialatropical.com/tropicrystal.

[6] Complaint, ¶ 34.

[7] Ibid.

[8] Complaint, ¶ 36.

PALMA product based on the products' respective trade dress. My study consisted of 579 likely purchasers of the Defendants' product—i.e., likely purchasers of domestic beer in South Florida ("relevant consumers").

7.     My likelihood of confusion survey provides evidence indicating a lack of likelihood of confusion among relevant consumers between the Defendants' Tropi Crystal product and the Plaintiff's PALMA product.[9] Specifically, the overall level of likelihood of confusion measured for the test product—Tropi Crystal, 50.8 percent—is virtually the same as the average of the overall likelihood of confusion measured across the internal controls— 50.0 percent. Additionally, the overall level of likelihood of confusion measured for the test product (Tropi Crystal, 50.8 percent) falls below that which was measured for the external control product (Cerveza Cristal, 69.3 percent). Thus, my survey finds zero percent net confusion between the test and control products.

8.     Because this study employed both internal and external controls which account for extraneous variables, the observed findings are directly applicable to the contested trade dress issues being litigated in this matter.

9.     Based on this study methodology and the resulting findings, I conclude that there is no likelihood of confusion among relevant consumers between the Defendants' Tropi Crystal product and the Plaintiff's PALMA product based on the products' respective trade dress.

10.     The methodology, results, and conclusions of this study are presented in detail in the sections that follow.

**FIRM OVERVIEW**

11.     I am a principal at Keegan & Donato Consulting, a consulting firm serving litigators and their clients. Our areas of expertise include marketing analysis, intellectual property, consumer survey research, damages analysis, forensic economic analysis, and related disciplines. Our firm designs and executes methodologically sound consumer survey

---

[9] Statistical testing performed at https://go.surveystar.com/starstat/z-test.htm.

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

research studies, conducts objective evaluation of existing survey research, and collaborates on a wide range of marketing and complex commercial litigation issues. We are also regularly engaged by clients for non-litigation consulting assignments related to marketing research and strategy.

12.     I have over 20 years of experience conducting consumer research. Over the course of my career, I have personally conducted over 1,000 consumer surveys reaching more than 250,000 consumers. Many of these surveys have been admitted into evidence in federal courts, state courts, at arbitration, to the Trademark Trial and Appeal Board, the National Advertising Division of the Council of Better Business Bureaus, and the United States International Trade Commission. I have also often served as a rebuttal witness. In the last four years, I have been deposed or testified at trial in conjunction with my involvement in litigation matters 33 times.

13.     I am a graduate of the University of Georgia's *Principles of Market Research Program*. This comprehensive course of study, developed in concert with the Market Research Institute International (MRII), is a post-graduate program for marketing industry professionals covering all aspects of the market research process. Coursework is based on the MRII's Market Research Core Body of Knowledge (MRCBOK), a compilation of the underlying principles and essential skills that comprise the market research process. Certification is conferred only upon participants who demonstrate mastery of concepts presented in 284 detailed module studies across 13 core areas of market research, as determined via rigorous proctored examinations. The University of Georgia's *Principles of Market Research Program* is endorsed by all major market research and insights industry associations, including ESOMAR and the Insights Association.

14.     I am a member of the American Marketing Association (AMA), the preeminent professional association for marketing practitioners and scholars. From the AMA, I have earned the designation of Professional Certified Marketer (PCM). The AMA confers the PCM certification upon individuals who have demonstrated a mastery of comprehensive and core marketing knowledge and principles. PCM certification requires

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

rigorous testing, ongoing professional development, and a commitment to upholding the highest standards in the marketing field. The AMA only accepts into the PCM certification program applicants with demonstrated professional experience in the field of marketing.

15.     My educational background additionally includes a Juris Doctorate degree from Brooklyn Law School and a Bachelor of Arts degree in History from Pace University. I have completed coursework in the Master of Business Administration program at the Lubin School of Business at Pace University and in Harvard University's Corporate Finance Certificate program. I have also served as a Registered Representative, National Association of Securities Dealers (Series 7, expired).

16.     Keegan & Donato Consulting is a member of ESOMAR, the leading global association for market, social, and opinion research, the American Association for Public Opinion Research (AAPOR), a professional organization of more than 2,000 public opinion and survey research professionals in the United States and from around the world, the International Trademark Association (INTA), and the Association for Consumer Research (ACR). I have published in an ESOMAR compendium on the benefits of methodologically sound marketing research. I have taught CLE-accredited courses on survey research for litigation at the Florida Bar's Annual IP Symposium and have addressed the Pennsylvania Bar Association's Intellectual Property Law group with a presentation on the building blocks of survey research for litigation, consumer research best practices, and current trends in the industry.

17.     Additional information about my credentials is provided at Exhibit 1 to this Declaration. Exhibit 1 also lists the matters in which I have provided testimony over the last four years. A listing of the documents I considered in formulating my opinions appears as Exhibit 2.

18.     I am being compensated at the hourly rate of $600 for my work in preparing this report and for any deposition, trial testimony, or consulting services that may be required. In addition, Keegan & Donato Consulting is being compensated a fixed fee of $55,000 for the preparation and execution of the consumer survey. Neither my nor Keegan

& Donato Consulting's compensation is dependent on the outcome of this case.

**METHODOLOGY**

**Study Integrity**

19.    I designed and executed this study of 579 South Florida-based likely purchasers of domestic beer products in accordance with accepted standards of survey research. For example, this survey follows the guiding principles for survey research for the purpose of litigation as outlined by Shari Diamond in the *Reference Guide On Survey Research*,[10] including but not limited to:

- Appropriate universe selection and sampling frame;
- Rigorous and valid survey design that is probative of the relevant issues in the case;
- Inclusion of representative, qualified respondents;
- Use of procedures to minimize potential biases in data collection;
- Use of objective, non-leading questions;
- Use of procedures to reduce guessing among respondents; and
- Full analysis and reporting of survey data.

20.    This research was also guided by the provisions of the Lanham Act[11] and recognized treatises in the area of trademark research.[12]

**Study Objective**

21.    The objective of the study that I designed and conducted in this case was to determine the extent to which, if at all, there is a likelihood of confusion among relevant consumers—*i.e.*, South Florida-based likely purchasers of domestic beer products—between the Defendants' Tropi Crystal product and the Plaintiff's PALMA product based

---

[10] Diamond, S. (2011). "Reference Guide On Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, pp. 359-423.

[11] 15 USC §1125.

[12] *See*, for example, McCarthy, J.T. (2020). *McCarthy on Trademarks and Unfair Competition, 5th Ed.*; Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*.

CASE NO. 3:23-cv-01104-JES-KSC

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

on the products' respective trade dress. The remaining sections of this report describe the methodology, findings, and conclusions of my study.

**Study Population**

22. Surveys are conducted by collecting data from a sample, or subset, of the population of interest, i.e., the larger group to which the study results may be projected. In a typical case alleging forward confusion, such as the current matter, the appropriate population from which to sample is likely purchasers of products bearing the "junior" user's mark or trade dress.[13] "Junior" user refers to the party that is a later entrant to the marketplace—in this case, La Tropical with its Tropi Crystal trade dress. Correspondingly, the "senior" user in this context refers to the party that is the earlier entrant in the marketplace with asserted trademark rights, i.e., Soltura with its PALMA trade dress.

23. Participation in the survey was restricted to individuals residing in South Florida,[14] the market in which the Defendants brew and sell their product. Respondents qualified to participate in the study if they indicated that they purchased domestic beer in the last 12 months or anticipated doing so in the next six months. Because the purchase of alcohol products in the U.S. is restricted by ago, only respondents aged 21 and older were permitted to participate in the study.

24. Respondents who met the study population definition were identified through the use of questions that screened study participants on the above criteria (*see* Questionnaire discussion below; the full questionnaire is available at Exhibit 3). Respondents who did not meet the study criteria outlined above were not permitted to participate in the survey.

25. Respondents were also asked to provide information regarding their race/ethnicity, heritage/origin, and language(s) spoken in their household. These questions were for informational purposes only and were not used for screening.

---

[13] "In a traditional case claiming 'forward' confusion, not 'reverse' confusion, the proper universe to survey is composed of the potential buyers of the *junior* user's goods or services." [Emphasis in original.] McCarthy, J.T. (2020). *McCarthy on Trademarks and Unfair Competition, 5th Ed.*, §32:159.

[14] Respondents residing in the following Florida counties were included in the study sample: Broward, Glades, Hendry, Martin, Miami-Dade, Monroe, and Palm Beach.

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**Study Design**

26.     This study employed a rigorous design using a test vs. control format, incorporating both internal and external controls. The test vs. control study design is used to determine the impact of a variable of interest above and beyond the baseline level of impact of extraneous variables in the marketplace.[15]

27.     The specific survey design employed in this study is a known as a sequential (or two-room[16]) lineup study.[17] The sequential lineup format places respondents into a marketplace scenario by exposing respondents to stimuli showing the Parties' trade dress (through sequential presentation) and measuring the extent to which consumers believe the product using the Defendants' trade dress originates from the same company (or an affiliated or sponsored company) as the company asserting trade dress rights (i.e., the Plaintiff), thereby gauging consumer confusion.

28.     A separate, unique group of survey respondents—the control cell—is exposed to an alternative and/or modified stimulus, known as an external control. As in the test cell, measurements are taken to determine the extent to which respondents believe the product using the external control's trade dress and the product using the Plaintiff's trade dress originate from the same or affiliated companies.

29.     The test cell and control cell findings are then compared to determine whether any material difference between observed consumer confusion levels exists between respondents in the test and control cells. To the extent that a material difference between the test and external control findings exists, this evidence weighs in favor of a likelihood of

---

[15] "By adding one or more appropriate control groups, the survey expert can test directly the influence of the stimulus." Diamond, S. (2011). "Reference Guide On Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, p. 398.

[16] In this context, "room" does not necessarily refer to two physical rooms, but a methodological design wherein one study stimulus is displayed to respondents (commonly, and in this study, in the online environment; first "room") and is then removed from view before respondents are exposed to additional study stimuli (second "room").

[17] Swann, J.B. (2022). "Likelihood-of-Confusion Surveys." in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, *Second Edition*. Diamond, S.S. and Swann, J.B., eds., American Bar Association, p. 66.

confusion finding. In the absence of a material difference between the test and external control findings, this evidence weighs in favor of a finding of no likelihood of confusion among relevant consumers resulting from the contested trade dress.

30. Internal controls were also employed to provide a measure of likelihood of confusion within a marketplace context (discussed below). All test cell respondents were first exposed to an image depicting the Plaintiff's PALMA product.[18] Next, respondents were shown a randomized array of product images of the internal control products, which included several Spanish/Latin American-labeled beer products (including Tropi Crystal). This presentation controls for common variables across the products presented and simulates a potential market environment in which relevant consumers would consider and purchase these types of products.

31. After this exposure, the array was removed from view and respondents were presented with a range of questions to determine whether they mistakenly believe Tropi Crystal and the internal control products to be put out by the same company as, associated with, or sponsored by the company that puts out PALMA (discussed in Questionnaire section below; the full questionnaire is available at Exhibit 3).

32. Respondents in the control cell were administered the same survey questions as test cell respondents; however, control cell respondents did not view the Defendants' Tropi Crystal product, but rather the study's external control stimulus. The external control stimulus is one means of assessing the baseline level of consumer confusion within the marketplace. Such baseline confusion is sometimes referred to by marketing researchers as "noise." In this context, the noise level represents the extent to which consumers mistakenly believe that the external control product is put out by the same company as or is somehow affiliated with the Plaintiff.

33. In this study, I used the current version of the Cuban Cerveza Cristal beer as the external control. Cerveza Cristal is the existing product sold by the Cuban government within the Cuban market and the product upon which both Parties' products are, at least in

---

[18] The PALMA product as it appears on https://cervezapalma.com. Accessed: 9/18/23.

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

part, based. As such, it is a product with which both Parties' products share common heritage. It is therefore an appropriate control because it establishes baseline confusion between the Plaintiff's product and the current version of the product from which both Parties' products originate. This provides a useful basis of comparison with any measured confusion between the Plaintiff and the Defendants.

34. Two devised beer products—Cordillera[19] and Toña[20]—were shown to respondents as internal controls.[21] Internal controls are another means of assessing noise within the product category. The sequence of likelihood of confusion questions are also administered to respondents for each of the internal control stimuli. In this way, the internal controls provide a measurement of noise by assessing the extent to which respondents mistakenly believe each of the internal controls to be put out by the same company as or, associated with, the Plaintiff.

35. The internal controls were presented with the Defendants' product as part of an array to convey to the respondent that a range of Spanish/Latin American-labeled beer products are available within the relevant market. The internal controls use trade dress that is similar to that of Tropi Crystal, but would not be considered to be infringing upon the plaintiff's trade dress. The internal and external control survey stimuli as used in my study are shown in reduced scale in Figure 2 below.

---

[19] https://www.bebidasbolivianas.com/productos/cerveza-cordillera.

[20] https://web.archive.org/web/20121005121928/http://www.cervezaToña.com/en/2_company.shtml.

[21] For a discussion of internal controls of the type employed in this study, see Jacoby, J. (2013). Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys, p. 249: "Questions are not the only survey elements that can serve a within-group or internal control function. Think of trademark surveys that involve product arrays where the test stimulus is shown within the array along with noninfringing control products or packages." *See also*, Rappeport, M. (2012). "Design Issues for Controls." in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*. Diamond, S.S. and Swann, J.B., eds., American Bar Association, pp. 236-237.

CASE NO. 3:23-cv-01104-JES-KSC

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION



*Figure 2. Survey Stimuli (reduced scale)*



36.     The internal controls also serve as distracter stimuli. As noted by trademark commentator Jacob Jacoby, distracter stimuli "are stimuli used either for diluting the respondents' attention with the expectation that this will lessen the chances they will be able to discern (or prematurely discern) the test stimulus that is the focus of the investigation, [and/or] for generating a level of distraction more comparable to the marketplace experience…"[22] Thus, the use of distracter stimuli help to ensure a realistic simulation of a potential marketplace within the survey environment.

**Data Collection**

37.     This survey was completed through online interviewing via the Internet. Online interviewing is the dominant data collection method used in marketing research

---

[22] *See* Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, p. 500.

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  today.[23] Data collection for this study took place in September 2023.

2       38.    The respondent sample for this project was provided by the Dynata[24] consumer

3  panel. Dynata is a leading provider of online sample for research projects in the U.S. and

4  across the globe. Dynata maintains an actively managed online panel of millions of

5  consumers. The Dynata U.S. consumer panel sample frame is large and diverse with

6  minimal risk of coverage and sample bias. Comprehensive intake interviewing facilitates

7  accurate pre-targeting on a broad range of demographic and psychographic variables in

8  accordance with the particular sampling criteria for a given study.[25] The pre-targeting

9  process encompasses thousands of data points and does not eliminate any potential

10 respondent from the selection set. Membership in the Dynata panel is by invitation only.

11      39.    Dynata employs and enforces a range of policies and procedures to ensure

12 "panel health"— *i.e.*, that the panel is representative and that respondents provide honest

13 and accurate answers to questions. Additional panel health checks include participation

14 limits, screening questions, digital fingerprinting, IP verification, anti-automation filtering,

15 random and illogical responding, capturing and removing flatliners and speeders, among

16 others. Dynata utilizes a "double opt-in" procedure in its recruitment process, which helps

17 to verify the respondent's identity and ensure the panel is populated by quality

18 participants.[26]

19      40.    Dynata is an industry leader in providing respondents for marketing research

20 at all levels, from Fortune 500 marketing departments to specialty consulting projects,

21 including marketing research for litigation. I have personally used Dynata as a sample

22 provider for many consumer research studies, am familiar with its panel health procedures,

23 and am satisfied that it provides high quality, representative respondents. The Dynata

24 consumer panel constituted the sampling frame of my study.

25

26 [23] *Global Market Research 2021: An ESOMAR Industry Report,* pp. 58-61.

27 [24] https://www.dynata.com.

[25] Ibid, p. 7.

28 [26] https://www.dynata.com.

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION

41.     The survey was programmed using an industry-leading online survey product platform and custom code integration. All survey programming was performed by Keegan & Donato Consulting. The survey platform facilitates the programming and execution of advanced survey designs, custom coding, complex skip logic, and advanced rotation and randomization of questions, answer options, and stimuli. All such options were employed wherever appropriate.

42.     In accordance with standard marketing research practice, I collected a small number of responses and then paused fielding of the survey to review the data and ensure proper survey administration through the online software platform. This step fulfills the function of a soft launch or pre-test.[27] The soft launch confirmed that the survey instrument was functioning properly and that respondents showed no signs of having difficulty understanding or completing the questionnaire. Accordingly, I proceeded to re-launch data fielding and complete data collection.

**Accuracy of Estimate**

43.     As is typical for trademark and trade dress surveys used in litigation, this survey was not conducted using an opt-in non-probability sample.[28] Confidence intervals, while not technically applicable to non-probability samples,[29] are commonly calculated by survey experts for non-probability samples[30]—including for trademark (and trade dress) surveys[31]— as the confidence interval provides context for interpreting the study results. I

---

[27] Diamond, S. (2011). "Reference Guide On Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, pp. 388-389.

[28] Diamond, S. (2011). "Reference Guide On Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, p. 382.

[29] Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, p. 391.

[30] "Technically speaking, the use of confidence intervals applies only to probability samples. That said, practitioners frequently rely on confidence intervals when evaluating findings from well-conducted non- probability [samples] as well." See Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, p. 892 at footnote 45.

[31] Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, p. 892.

CASE NO.  3:23-cv-01104-JES-KSC
DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

was asked to provide this context for my study.

44.     Surveys typically, and in this case, are designed such that the results are reliable at the 95 percent confidence level.[32] A total of 579 respondents split across two cells averaging 289 unique members qualified for and completed the questionnaire (see full disposition of contacts at Exhibit 7). Samples of this size are associated with a maximum margin of error of ±5.8 percentage points at 95 percent confidence.[33]

**Bias Management**

45.     All efforts were made to present the survey questions in an objective, unbiased, and non-leading format. Respondents were presented with a "don't know," "no opinion," or equivalent answer option wherever appropriate throughout the survey to minimize guessing.

46.     It is common in consumer survey research, both for litigation and more broadly, for the researcher to employ various types of randomization of questions and answer options across respondents. Randomization is an important tool that researchers use to minimize the potential for order bias (i.e., order effects) to impact the study's results. Order bias refers to a respondent's tendency to select the first answer in a given list of answer options regardless of the question content[34] or answer the first question in a series of questions differently than later questions.[35] In this study, randomization was employed

---

[32] "Traditionally, scientists adopt the 95% level of confidence, which means that if 100 samples of the same size were drawn, the confidence interval expected for at least 95 of the samples would be expected to include the true population value." *See* Diamond, S. (2011). "Reference Guide On Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, p. 381.

[33] Statistical calculation performed at https://www.surveysystem.com/sscalc.htm.

[34] Visser, P. S., Krosnick, J. A., & Lavrakas, P. J. (2000). Survey research. In H. T. Reis & C. M. Judd (Eds.), *Handbook of Research Methods in Social and Personality Psychology*. Cambridge University Press, p. 240.

[35] *See* Diamond, S. (2011). "Reference Guide On Survey Research," in Reference Manual on Scientific Evidence. Federal Judicial Center/National Academy of Sciences, p. 396: "To control for order effects, the order of the questions and the order of the response choices in a survey should be rotated, so that, for example, one-third of the respondents have Product A listed first, one-third of the respondents have Product B listed first, and one-third of the respondents have Product C listed first. If the three different orders are distributed randomly among respondents, no response alternative will have an inflated chance of being selected

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

wherever possible to minimize the potential for order bias.

47.     Masking items were also used throughout the survey. Masking is used in surveys to obscure the intended purpose of a question from the respondent, thereby reducing biases in the data. A variety of answer option masking items were included throughout the questionnaire wherever appropriate to prevent the sample from being tainted unnecessarily.[36]

48.     The final data was examined to ensure data integrity. First, I examined the data to identify "speeders." Respondents who complete the survey too quickly may introduce respondent-related error into the survey data. Respondents were flagged if they completed the survey in less than one-third of the median completion time across all respondents in the sample.[37] One respondent was removed from the sample based on this criterion.

49.     I also reviewed the data for low-quality and nonsense responses. Low-quality responses are not reflective of actual consumer opinions and therefore introduce biases into the data. Based on this criterion, 68 respondents were removed from the sample.

50.     Finally, an attention filter question asked respondents to type the word "green" into a text box to ensure that participants were devoting sufficient attention to the survey task at hand. Two respondents were removed from the sample based on the attention filter. All removed responses are provided at Exhibit 6.

51.     To reduce the potential for undesirable respondents to participate in the study, the screening portion of the questionnaire employed security questions, including a CAPTCHA question to prevent bots and other automated respondents from participating in

---

because of its position, and the average of the three will provide a reasonable estimate of response level."

[36] For example, in this case, masking takes the form of neutral answer options that conceal the item of interest. Masking was employed for all questions in the screener and main questionnaire where applicable.

[37] Less than one-third of the median completion time is the industry standard for identifying speeders for removal. See for example, Kugler, M.B. and Henn, Jr., R.C., (2022). "Internet Surveys in Trademark Cases." in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Second Edition*. Diamond, S.S. & Swann, J.B. (eds.), American Bar Association, pp. 305-306. See also, https://www.responsivmr.com/news/evaluating-and-ensuring-survey-respondent-quality.

the study. Respondents who did not pass the security measures were not permitted to complete the survey.

52.     The study was conducted under "double blind" conditions—neither the panel providers nor the survey participants knew the purpose of the study or the sponsoring party. Double blind research is designed to prevent external or circumstantial bias from impacting the survey process and results.

**Questionnaire**

53.     In consumer surveys, data are collected by means of a questionnaire. In this case, the questionnaire was divided into two parts: a screener portion and the main questionnaire.

54.     The screener portion of the questionnaire qualified respondents based on the participation requirements outlined in the "Study Design" section above. Respondents who did not meet the criteria for participation in the survey were terminated. Respondents were also asked several questions about the languages that are spoken in their household and their race and origin.

55.     The main portion of the questionnaire first exposed respondents to the PALMA product, as shown in Figure 3 below.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

*Figure 3. Presentation of PALMA product in survey (reduced scale)*



56.     Next, the PALMA product was removed from view and respondents were presented with an array of Spanish/Latin American-labeled beer products, which included Defendants' Tropi Crystal product (or the control product) and the two internal controls/third-party distracters: Cordillera and Toña. The position of the products in the array was randomized for all respondents. The array products as displayed in the

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION

questionnaire are shown in Figure 4 below (Defendants' product—test cell—shown for demonstration purposes).

*Figure 4. Array products, test cell (reduced scale)*



CASE NO. 3:23-cv-01104-JES-KSC
DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION



Click the "Next" button below to continue.

Next >>

57.    The study stimuli were then removed from view and the main questionnaire administered the key study measures gauging respondents' perceptions of likelihood of confusion. Likelihood of confusion was assessed across three component measures: whether the Parties are the same company; whether the parties are affiliated, connected, or associated; and whether the Plaintiff sponsored or approved the Defendants. The main questionnaire concluded with several standard demographic questions regarding education level, gender, and household income, as well as a final attention filter question. The full questionnaire is provided at Exhibit 3.

**SAMPLE CHARACTERISTICS**

58.    The sample for this study is geographically representative, providing a robust, projectable overview of the opinions of South Florida-based likely purchasers of domestic

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION

beer products. Demographic characteristics for the study participants are shown in Table 1 below.

*Table 1. Sample characteristics - demographics*[38]

| | % Respondents (n=579) |
|---|---|
| **Age** | |
| 21 - 30 | 18.0 |
| 31 - 40 | 30.1 |
| 41 - 50 | 18.0 |
| 51 - 60 | 16.2 |
| 61 - 70 | 10.0 |
| 71 or older | 7.8 |
| **Education** | |
| Less than high school | 0.9 |
| High school graduate | 14.2 |
| Some college | 19.2 |
| 2 year degree | 10.9 |
| 4 year degree | 33.5 |
| Master's / Professional degree | 18.3 |
| Doctorate | 3.1 |
| **Household income** | |
| Under $35,000 | 12.8 |
| $35,000 - $49,999 | 14.2 |
| $50,000 - $74,999 | 20.0 |
| $75,000 - $99,999 | 15.9 |
| $100,000 - $124,999 | 9.0 |
| $125,000 - $149,999 | 10.9 |
| $150,000 or more | 14.0 |
| Prefer not to answer | 3.3 |
| **Gender** | |
| Male | 46.5 |
| Female | 52.8 |
| Non-binary or other | 0.0 |
| Prefer not to answer | 0.7 |
| **Household languages** | |
| English only | 53.9 |
| English and another language(s) | 40.9 |
| Language(s) other than English | 5.0 |
| Prefer not to answer | 0.2 |

---

[38] Percentages may not add to 100 due to rounding and/or sub-sampling.

| Languages other than English | |
|---|---|
| Spanish | 39.6 |
| Chinese | 0.2 |
| Tagalog/Filipino | 0.2 |
| Vietnamese | 0.0 |
| Other | 5.5 |
| Prefer not to answer | 0.5 |
| **Race/Ethnicity** | |
| White, non-Hispanic | 47.8 |
| Hispanic (White or non-White) | 34.9 |
| Black or African American | 13.3 |
| Native American or Alaska Native | 0.0 |
| Asian | 1.6 |
| Native Hawaiian or Pacific Islander | 0.2 |
| Other | 2.1 |
| Prefer not to answer | 0.2 |
| **Spanish/Latin American Heritage/Origin** | |
| Mexican, Mexican American, or Chicano | 3.5 |
| Puerto Rican | 5.9 |
| Cuban / Cuban American | 11.7 |
| Another Hispanic, Latino, or Spanish origin | 13.5 |
| Prefer not to answer | 0.3 |
| **Florida County** | |
| Broward | 29.9 |
| Glades | 0.3 |
| Hendry | 0.3 |
| Martin | 2.8 |
| Miami-Dade | 41.8 |
| Monroe | 1.0 |
| Palm Beach | 23.8 |

**RESULTS & ANALYSIS**

59.   The findings of this study support a finding of no likelihood of confusion among relevant consumers between the Defendants' Tropi Crystal product and the Plaintiff's PALMA product.[39] Specifically, the overall level of likelihood of confusion measured in the test product— Tropi Crystal, 50.8 percent—is virtually the same as the

---

[39] Statistical testing performed at https://go.surveystar.com/starstat/z-test.htm.

CASE NO. 3:23-cv-01104-JES-KSC
DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

average of the overall likelihood of confusion measured across the internal controls—50.0 percent. Additionally, the overall level of likelihood of confusion measured for the test product (Tropi Crystal, 50.8 percent) falls below that which was measured in the external control product (Cerveza Cristal, 69.3 percent). A summary of the study results is presented in Table 2 below.

*Table 2. Likelihood of confusion measurement*[40]

| | Test Cell | | | Control Cell | | |
|---|---|---|---|---|---|---|
| | Tropi Crystal | Cordillera | Toña | Cerveza Cristal | Cordillera | Toña |
| (Base: All Respondents) | (299) % | (299) % | (299) % | (280) % | (280) % | (280) % |
| Same company | 42.5 | 40.8 | 48.5 | 60.4 | 32.5 | 38.9 |
| Affiliated, connected, or associated | 5.7 | 7.4 | 7.0 | 7.1 | 8.9 | 6.4 |
| Sponsored or approved | 2.7 | 1.7 | 2.7 | 1.8 | 2.9 | 2.5 |
| Total: same/affiliated/sponsored | 50.8 | 49.8 | 58.2 | 69.3 | 44.3 | 47.9 |
| Not same/affiliated/sponsored | 32.4 | 34.1 | 25.8 | 13.6 | 32.1 | 26.4 |
| Don't know / No opinion | 16.7 | 16.1 | 16.1 | 17.1 | 23.6 | 25.7 |

60. It is standard practice in a survey design of this type to deduct or "net" the control findings from the test findings.[41] In this case, deducting the total confusion finding for the external control product (69.3 percent) from that of the test product (50.8 percent) yields a negative net confusion measurement. This supports a finding of no likelihood of confusion between the Parties' respective trade dress and that any measured likelihood of confusion is attributable to noise.

61. The internal control results also support a finding of no likelihood of confusion between the Parties. As shown in Table 2 above, both of the internal controls—Cordillera and Toña— generated essentially the same confusion findings with respect to the Plaintiff's

[40] Percentages may not add to 100 due to rounding.
[41] Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, pp. 910-911.

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   PALMA product as compared to the Defendants' Tropi Crystal product.

2       62.    Specifically, the composite likelihood of confusion measures between the

3   PALMA product and the internal controls are as follows: Cordillera, 49.8 percent (test cell),

4   44.3 percent (control cell); and Toña, 58.2 percent (test cell), 47.9 percent (control cell).

5   Together, the internal controls yielded an average confusion measurement of 50.0 percent.

6   Because the Tropi Crystal likelihood of confusion measurement (50.8 percent) is virtually

7   the same as the average internal control likelihood of confusion measurement, this provides

8   additional support that there is no net confusion between PALMA and Tropi Crystal and

9   that any measured likelihood of confusion between the Parties' respective trade dress is

10  attributable to noise within the market.

11  **CONCLUSIONS**

12      63.    The results of this study of 579 South Florida-based likely purchasers of

13  domestic beer products shows that there is <u>no likelihood of confusion</u> among consumers

14  between the Defendants' Tropi Crystal product and the Plaintiff's PALMA product.

15  Specifically:

16      •   The overall level of likelihood of confusion measured for the test

17          product – Tropi Crystal, 50.8 percent – is virtually the same as the

18          average of the overall likelihood of confusion measured across the

19          internal control products – 50.0 percent;

20      •   The overall level of likelihood of confusion measured for the test

21          product (Tropi Crystal, 50.8 percent) falls below that which was

22          measured for the external control product (Cerveza Cristal, 69.3

23          percent); and

24      •   All measured of likelihood of confusion is attributable to noise within

25          the market and is not attributable to the alleged similarity of the

26          Defendant's Tropi Crystal product to the Plaintiff's PALMA product.

27      64.    Overall, the findings of this study demonstrate that relevant consumers do not

28  confuse the source origin of domestic beer products using the Tropi Crystal trade dress with

1   that of beer products using the PALMA trade dress. Because the survey design employed
2   appropriate and rigorous controls, the likelihood of confusion findings are directly
3   applicable to the contested trade dress allegations.

4           65.     The survey conducted in this case was designed and executed in accordance
5   with accepted standards of survey research. All findings and conclusions are presented with
6   a reasonable degree of certainty.

7           I hereby declare under penalty of perjury under the laws of the United States of
8   America that the foregoing is true and correct.

9           Executed on September 27, 2023 at Rye, New York.

_____
Mark Keegan

DECLARATION OF MARK KEEGAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION